## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JASON BEARD,**

*Plaintiff,*

v.

**SHIVA FINANCE, LLC d/b/a CC FLOW, TOTAL LOAN SERVICES, LLC, AMIGA SERVICES, LLC,** *and* **CAPITAL COMMUNITY BANK, INC.,**

*Defendants.*

Case Number:

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, **Jason Beard** ("**Mr. Beard**"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, **Shiva Finance, LLC**, doing business as **Advance Financial 24/7** ("**Advance**") and **CC Flow**, **Total Loan Services, LLC** ("**TLS**"), **Amiga Services, LLC** ("**Amiga**"), and **Capital Community Bank, Inc.** ("**CCB**") (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Mr. Beard against the Defendants for violations of the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("**RICO**"), the *Truth in Lending Act*, 15 U.S.C. § 1601, *et seq.* ("**TILA**"),

the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("**FCCPA**"), the Florida *Civil Remedies for Criminal Practices Act*, § 772.101, Fla. Stat., *et seq.* ("**CRCPA**"), and for **Unjust Enrichment**.

## JURISDICTION AND VENUE

2.     Subject matter jurisdiction for Plaintiff's TILA and RICO claims arises under 15 U.S.C. § 1601 and 18 U.S.C. § 1965, respectively, and 28 U.S.C. § 1331, as TILA and RICO are federal statutes, and the relevant transactions were committed within the Middle District of Florida.

3.     This Court has supplemental jurisdiction over Plaintiff's FCCPA and CRCPA claims under 28 U.S.C. § 1367.

4.     The Defendants are subject to the jurisdiction of this Court pursuant to § 48.193, Fla. Stat., and Fed. R. Civ. P. 4(k).

5.     Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(b)(2), because the acts complained of were committed and/or caused by the Defendants within Pasco County, which is in the Middle District of Florida.

## PARTIES

### Mr. Beard

6.     **Mr. Beard** is a natural person residing in Wesley Chapel, Pasco County, Florida.

7.     Mr. Beard is a *Consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

## Advance

8.    **Advance** is a Delaware limited liability company with a principal business address of **100 Oceanside Dr., Nashville, TN 37204**.

9.    Advance's Delaware registered agent is **Harvard Business Services, Inc., 16192 Coastal Hwy, Lewes, DE 19958**.

## Amiga

10.    **Amiga** is believed to be a limited liability company, under the care of Advance, which has a principal business address of **100 Oceanside Dr., Nashville, TN 37204.**

11.    Amiga can be served at Amiga Services, LLC, c/o Advance Financial 24/7, **100 Oceanside Dr., Nashville, TN 37204.**

## TLS

12.    **TLS** is an Ohio limited liability company with a principal business address of **205 Sugar Camp Circle, Dayton, OH 45409**.

13.    TLS' Ohio registered agent is **CH&K Agent Service, Inc., 1 South Main St., Suite 1300, Dayton, OH 45402.**

## CCB

14.    **CCB** is a Utah corporation with a principal business address of **3280 N. University Ave., Provo, UT 84604**.

15.    CCB's Utah registered agent is **Matthew Field, 3280 N. University Ave., Provo, UT 84604.**

## FACTUAL ALLEGATIONS

16.     Around December 20, 2022, Mr. Beard obtained an open-end line of credit from Advance and TLS, marketed under the CC Flow name (the "**CC Flow Account**"). **SEE PLAINTIFF'S EXHIBIT A.**

17.     The initial credit line on the CC Flow Account was $300.00. ***Id.***

18.     In disclosures to their customers, the Defendants do not express fees in terms of *annual percentage rate* ("APR"). Rather, they state there is a "Billing Cycle Charge" based upon the principal loan balance.

19.     The "Billing Cycle Charge" is also referred to as a finance charge, *i.e.*, interest.

20.     For example, the Defendant's periodic statement rendered to Mr. Beard on February 1, 2023 indicates he was charged $51.50 in fees related to the carrying of a principal balance of $291. **SEE PLAINTIFF'S EXHIBIT B.**

21.     The APR for the aforementioned billing cycle, extrapolated to a yearly rate, was roughly 215.3%.

22.     Thus, the effective interest rate on the CC Flow Account exceeded 45% annually.

23.     Extensions of credit issued via CC Flow are purportedly made through CCB, a state-chartered bank based in Utah.

24.     However, as explained in more detail below, CCB had virtually no involvement in the underwriting or approval of Mr. Beard's CC Flow Account.

25.     Likewise, CCB had no involvement in the billing, collection, or servicing of Mr. Beard's CC Flow Account. CCB did, however, knowingly participate in the scheme outlined below and profited from it.

26.     Mr. Beard applied for the CC Flow Account while located and living in Pasco County, Florida.

27.     § 687.02(2), Fla. Stat. renders an extension of credit made at interest rates **greater than 25%** a second-degree misdemeanor.

28.     § 687.071(3), Fla. Stat. renders an extension of credit made at annual interest rates **greater than 45%** a third-degree felony.

29.     § 687.071(7), Fla. Stat. renders an extension of credit with an annual interest rate exceeding 25%, and logically any debt stemming from such extension of credit, void and unenforceable.

30.     Any person who willfully makes a criminally usurious extension of credit forfeits the right to collect payment for the extension of credit because such extensions of credit are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

31.     Under Florida law, even the recovery of the principal balance on extensions of credit made with annual interest rates exceeding 25% is impermissible. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. Dist. Ct. App. 1988).

32.     The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 148 Fla. 401, 4

So.2d 519 (1941); *see also Pushee v. Johnson*, 123 Fla. 305, 166 So. 847 (1936); *River Hills, Inc. v. Edwards*,190 So.2d 415 (Fla. 2d DCA 1966).

33.    Because the CC Flow Account is subject to an annual interest rate that exceeds even the 45% limit as proscribed in § 687.071(3), Fla. Stat., the balance is void *ab initio* and unenforceable pursuant to § 687.071(7), Fla. Stat.

34.    The balance on the CC Flow Account is therefore an "unlawful debt" per § 772.102(2)(a)(3), Fla. Stat. and 18 U.S.C. § 1961(6).

35.    Any amount repaid on an illegal, usurious debt deemed void *ab initio* by state law constitutes unjust enrichment, even if less than the original amount of the loan. *See, e.g., Williams et al. vs. Big Picture Loans, LLC*, case 3:17-cv-461, E.D. Virginia, July 20, 2021.

36.    Mr. Beard has made several payments towards the CC Flow Account.

### Advance Engages in Rent-a-Bank Scheme with CCB

37.    Usury laws have been the cornerstone of consumer financial protection in America since colonial times; at their core, usury laws were the earliest form of consumer protection law.[1]

38.    Usury laws protects the consumer, who may be less-sophisticated than the lender and who may, in desperation, enter into one-sided agreements which unfairly advantage the lender.

---

[1] Virginia, for example, began restricting interest rates in 1730, as it believed excessive interest rates to be unconscionable. Indeed, the notion that charging a person excessive rates to borrow money is unconscionable dates back to Biblical times (see, e.g., Prov. 28:8, Ex. 22:25, Deut. 23:19).

39.     Likewise, usury laws protect the consumer's family and taxpayers, as consumers subject to usurious loans can become trapped by such loans, resulting in bankruptcy and a burden on the public.[2]

40.     Every state has laws restricting usury, with most states, including Florida, restricting interest to specific percentage rates.

41.     Since the late 1970s, federally-chartered banks have been able to export the maximum interest rate of their home state; federally-chartered banks are not technically exempt from any other state's usury statues, but rather allowed to assert a choice-of-law provision in their contracts. See *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 301 (1978); 12 U.S.C. §§ 85, 1463(g)(1), 1831d.

42.     As federally-chartered banks are subject to high degrees of regulation and oversight, including the FDIC's ability to issue cease-and-desist orders to federally-chartered banks engaging in unsafe banking practices[3], this regulatory framework is presumed to be a sufficient substitute for state usury laws, without subjecting banks to liability under a patchwork of state laws restricting interest rates.

43.     While the formation of a non-bank company is simple, obtaining a banking charter is difficult because the chartering authority requires regulatory

---

[2] Eric A. Posner, *Contract Law in the Welfare State: A Defense of the Unconscionability Doctrine, Usury Laws, and Related Limitations on the Freedom To Contract*, 24 J. LEGAL STUD. 283, 301–02 (1995).
[3] 12 U.S.C. § 1818(b)–(c).

consideration of numerous factors, including the public interest and the background of its owners.

44.    The rise of online lending in the late 1990s created a new phenomenon—non-bank FinTech lenders who would "partner" with small banks in more usury-friendly states to offer loans at 150%, 200%, or even 300% interest rates, in what soon became known as "rent-a-bank" schemes.

45.    While such schemes have several different variants, they all hew to the same outline:

   a.    The design of the loan product, including the name of the product (*e.g.*, CC Flow) is proposed by a nonbank to the bank;

   b.    The bank outsources all or nearly all factors of production concerning the loans (*i.e.*, marketing, underwriting, funding, and servicing);

   c.    These services are outsourced to a single nonbank entity (*e.g.*, Advance and its related subsidiaries); and,

   d.    There is a transfer of all or almost all of the credit risk on the loans either to the nonbank and related subsidiaries directly, or to third party "investors" through transactions arranged by the nonbank.

46.    Essentially, the nonbank and its affiliates initiate the relationship, propose all aspects of the loan process be outsourced to it, provide all or nearly all of the factors necessary to make the loans, and then acquire most of the economic

interest in the loans to facilitate the off-loading of those interests to a third party, creating a modest but guaranteed profit for the bank on each loan.

47.     Thus, rather than a bank using its own lending expertise to create a loan product, while outsourcing certain operational aspects to nonbank entities as a cost-savings measure, the nonbank entity is the creator and outsources *de minimus* aspects of the loan process to the bank, whose only contribution is to permit the use of its status as a federally-chartered bank to be the lender of record.

48.     In an effort to avoid state usury laws, Advance, a non-bank, entered into a sham agreement where it "partnered" with CCB in a "rent-a-bank" arrangement to create the loan product CC Flow.

49.     As aforementioned, the Defendants claim that extensions of credit made under the CC Flow name to Florida residents are originated by CCB, a small bank located in Provo, Utah.

50.     However, as CCB had virtually no involvement in the underwriting, approval, billing, collection, or servicing of Mr. Beard's CC Flow Account, this claim is fiction.

51.     The money used to fund the extension of credit concerning the CC Flow Account to Mr. Beard overwhelmingly belonged to Advance, its subsidiaries or related entities, and/or other investors Advance may have sold a security interest in the receivable to, and not to CCB.

52.     Advance, TLS, and Amiga, directly or via their related non-bank parent companies and subsidiaries, were the entities which provided notices to Mr. Beard, as required by law, such as adverse reaction notices, agreements, and billing statements.

53.     Advance, Amiga, and TLS, either directly or through its contractors, performs virtually all of the activities related to CC Flow's lending business – including underwriting, collection, servicing, payment, and remittance operations.

54.     Advance and TLS reported payment data and credit history to Clarity Services, Inc. ("**Clarity**"), a nationwide *Consumer Credit Reporting Agency* ("**CRA**"). **SEE PLAINITIFF'S EXHIBIT C.**

55.     The CC Flow tradeline shows the creditor named as "CCFLOW/TLS/AF247." ***Id.***

56.     This is shorthand to indicate the loan product is called "CCFLOW" and the creditors are TLS, or Total Loan Services, and AF247, or Advance Financial 24/7, another trade name of Advance.

57.     Notably, there is no reference to CCB anywhere in the reporting. ***Id.***

58.     Advance and TLS obtained a credit report from Clarity as part of its underwriting process; the record of the inquiry is logged by Clarity as having been made by "CCFLOW/TLS/AF247."

59.    Advance claims its CC Flow loans and lines of credit are made by CCB and that Advance (along with TLS and Amiga) are simply the *servicers* of the loans for its bank partner, CCB.

60.    However, as aforementioned, CCB has virtually nothing to do with the loans and lines of credit Advance makes utilizing the CC Flow name – other than to rent its name and status as a state-chartered bank to Advance, a non-bank entity.

61.    Once the CC Flow loan was purportedly made by CCB to Mr. Beard, the loan (or the rights to the receivables corresponding to the loan) was almost immediately sold by CCB and assigned to Advance and/or subsidiary entities under the control of Advance.

62.    CCB's sole function in the loan process is to make it appear that a Utah bank is the true creditor of CC Flow accounts, even though objectively it is not.

63.    CCB, no stranger to rent-a-bank schemes, also "partners" with several other FinTech lenders to make consumer loans at interest rates which are illegal in many states, including Opportunity Financial, a lender which makes short-term loans to consumers at rates around 160% annually.

64.    CCB offers no credit card products or other unsecured consumer loans directly.

65.    CCB's consumer lending business is overwhelmingly generated by its "partnerships" with entities like Advance.

66.   The loan made to Plaintiff by Advance, ostensibly via CCB, is:

a.   funded with a credit line controlled by Advance and its subsidiaries;

b.   underwritten and approved by Advance, using Advance's proprietary technology; and,

c.   collected by Advance, TLS and Amiga, directly or via contractors.

67.   Advance, directly or through one or more related companies it controls, indemnifies CCB for any loss related to the CC Flow loans.

68.   CCB stands to lose nothing if a loan or extension of credit goes bad.

69.   Likewise, CCB stands to profit very little in the event an extension of credit is paid in full at illegal annual interest rates, like the CC Flow Account granted to Mr. Beard.

70.   Rather, CCB collects a small, but guaranteed, fee for each loan or extension of credit originated as part of the rent-a-bank scheme with Advance.

71.   CCB is also paid a small amount of the profits from CC Flow loans.

72.   Advance maintains a cash collateral account with CCB, an alternative collateral account, and letters of credit that benefit CCB.

73.   This provides three extra layers of protection for CCB, at the expense of Advance, to ensure CCB loses no money even if a loan the bank "made" does not perform.

74.    As the entity with the predominant economic interest in loans made to consumers like Mr. Beard, Advance, and not CCB, is the true lender of such accounts, including Mr. Beard's. *See Fulford v. Marlette Funding, LLC,* No. 17CV30376 and *Fulford v. Avant of Colorado, LLC,* No. 17CV30377 (Colo. Dist. Ct. Denver County Aug. 13, 2018); see also, e.g., *State Bank v. Strong*, 651 F.3d 1241 (11th Cir. 2011); Easter v. Am. W. Fin., 381 F.3d 948, 957 (9th Cir. 2004); *CFPB v. CashCall, Inc.*, No. CV 15-7522-JFW (RAOx), 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016); *Penn v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016); *Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711 (E.D. N.C. 2002); *CashCall, Inc. v. Morrisey*, No. 12-1274, 2014 WL 2404300 (W. Va. May 30, 2014) (memorandum decision); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190 (N.D. Cal. 2012); and *Eul v. Transworld Sys.*, No. 15 C 7755, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017).

75.    Moreover, Florida's "usury statutes show clear legislative intent to prevent accomplishment of a usurious scheme by indirection, and the concealment of the needle of usury in a haystack of subterfuge." *Pinchuck vs. Canzoneri*, 920 So. 2d 713, 715-16, (Fla. 4th DCA, 2006).

76.    Advance and CCB are aware that almost all consumers will believe that a state-chartered bank, insured by the FDIC, and subject to substantial regulatory scrutiny, will charge interest and fees only as allowed by law.

77.    The imprimatur of the FDIC's insurance of CCB makes loan products like CC Flow appear more legitimate to a consumer than they otherwise would if the identical loan was marketed by Advance, a foreign, non-bank entity.

78.    Mr. Beard used the proceeds from the CC Flow Account to make personal and household purchases.

79.    Therefore, the alleged balance due on the CC Flow Loan meets the definition of *Debt* under the FCCPA, § 559.55(6), Fla. Stat.

80.    Mr. Beard drew on the line of credit, after which withdrawals were made from his bank account in Florida.

81.    Mr. Beard received collection correspondence at his residence in Florida.

82.    In their disclosures to its customers, the Defendants do not express their fees in terms of APR, in part to obfuscate the exceedingly high cost of their loans – rates that almost every state would hold to be usurious.

83.    Pursuant to TILA, the Defendants were required to disclose to Mr. Beard the cost of finance charges assessed, expressed as an annual percentage rate.

84.    Further, TILA required the Defendants to disclose the annual percentage rate and finance charge clearly and conspicuously in writing.

85.    The Defendants were also required by 15 U.S.C. § 1638(a)(8) to explain in detail the meaning of "annual percentage rate" and "finance charge."

86.     The Defendants provided no TILA disclosure mentioning the "annual percentage rate," much less providing a disclosure which contained an accurate one.

87.     The Defendants also failed to provide the APR assessed in their monthly periodic statements to Mr. Beard.

88.     The Defendants willfully and intentionally omitted the legally required TILA disclosures so as to not draw attention to the fact that its extension of credit to Mr. Beard imposed illegal interest rates.

89.     Advance is the beneficial owner of CC Flow and knowingly receives profit, directly or indirectly through subsidiaries, generated by CC Flow's usurious loans. If Advance also sells some of its receivables to non-bank, third-party investors, those purchasers may also be liable under the statutes.

90.     Amiga C is listed as the "servicer" on Mr. Beard's CC Flow loan contract and thus received some portion of the unlawful interest and fees collected from Mr. Beard.

91.     TLS is also a servicer of the loan, as indicated in its name appearing as a "creditor" in reports about Mr. Beard to Clarity.

92.     RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

93.    In *Boyle v. United States*, the Supreme Court recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. 938, 944 (2009).

94.    Thus, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

95.    Here, Defendants are an association in fact enterprise that associated together for the common purpose of making, collecting, and profiting off illegal loans.

96.    Mr. Beard has repaid a portion of the unlawful CC Flow Account, including interest and fees to the Defendants.

97.    Mr. Beard has suffered severe emotional distress as a result of the Defendants' attempts to collect an unenforceable account.

98.    Mr. Beard has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## <u>VIOLATIONS OF RICO,18 U.S.C § 1962(c)</u>

99.    Mr. Beard incorporates Paragraphs 1 – 98 as if fully restated herein.

100.    The Defendants, through their common purpose of engaging in a course of conduct to profit from CC Flow, constitute an "enterprise" under RICO, 18 U.S.C. § 1961(4).

101.    The CC Flow Account charged an interest rate far in excess of Florida's maximum permitted rate, and thus constituted an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

102.    The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collection of an unlawful debt.

103.    The Defendants' participation in the enterprise violated **18 U.S.C. § 1962(c)** and caused Plaintiff to incur costs directly and proximately related to their attempts to collect unlawful extensions of credit.

104.    The Defendants utilized the internet, telephone, and/or mail to reach across state lines in the operation of the CC Flow platform, through:

     a.   collection calls;

     b.   credit reporting;

     c.   electronic mail; and,

     d.   ACH deposits to Mr. Beard's Florida bank account.

105.    Accordingly, the Defendants are jointly and severally liable to Mr. Beard for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages;

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT II
## VIOLATIONS OF RICO,18 U.S.C § 1962(d)

106.    Mr. Beard incorporates Paragraphs 1 – 98 as if fully restated herein.

107.    The Defendants, through their common purpose of engaging in a course of conduct to profit from CC Flow, constitute an "enterprise" under RICO, 18 U.S.C. § 1961(4).

108.    The CC Flow Account charged an interest rate far in excess of Florida's maximum permitted rate, and thus constituted an "unlawful debt" pursuant to 18 U.S.C. § 1961(6).

109.    The Defendants violated **18 U.S.C § 1962(d)** by conspiring with each other, and other persons, to issue and collect unlawful debts through the CC Flow lending platform.

110.    The Defendants each took actions in furtherance of this conspiracy when they, at various times, did the following:

    a.  issued the CC Flow Account to Mr. Beard;

    b.  initiated ACH deposits and withdrawals to and from Mr. Beard's bank account;

    c.  attempted collection of the credit line through emails and phone calls to Mr. Beard; and/or,

    d.  claimed CCB ownership of CC Flow accounts to provide a guise of issuance from a bank.

111.    The Defendants also each agreed to the overall objective of the conspiracy – to issue and collect unlawful extensions of credit through CC Flow.

112.    The Defendants utilized the internet, telephone, and/or mail to reach across state lines in furtherance of their conspiracy.

113.    Accordingly, the Defendants are jointly and severally liable to Mr. Beard for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

    a.    Threefold the amount of actual damages;

    b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

    c.    Any other relief this Court deems equitable and proper under the circumstances.

## COUNT III
## VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.

114.    Mr. Beard incorporates Paragraphs 1 – 98 as if fully restated herein.

115.    The Defendants knew the annual interest rate on the CC Flow Account exceeded 45% in violation of § 687.071(3), Fla. Stat.

116.    The Defendants' knowledge of the illegal nature of the extension of credit is evinced by the great lengths they have gone in an attempt to avoid Florida law by use of a "rent-a-bank" scheme.

117.    The Defendants attempted to enforce the unlawful debt and/or asserted the legal right to enforce the unlawful debt when they: (a) attempted collection of the CC Flow Account via emails and phone calls to Mr. Beard; and, (b) initiated ACH debits from Mr. Beard's checking account in an attempt to obtain payment.

118.    The Defendants' actions were willful, intentional, and done for the express purpose of collecting an unenforceable debt from Plaintiff and profiting from such collection.

119.    Accordingly, the Defendants are jointly and severally liable to Plaintiff for his actual damages including all principal and interest repaid to the Defendants, and statutory damages of up to $1,000.00, punitive damages, costs, and attorney's fees pursuant to § 559.77, Fla. Stat.

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.     Statutory damages of **$1,000.00** pursuant to § 559.77(2), Fla. Stat.;

b.     Actual damages pursuant to § 559.77(2), Fla. Stat.;

c.     Injunctive relief preventing the Defendants from attempting to collect the alleged balance from Mr. Beard pursuant to § 559.77(2), Fla. Stat.;

d.     Reasonable costs and attorney's fees pursuant to § 559.77(2), Fla. Stat.; and,

e.     Such other relief that this Court deems just and proper.

## COUNT IV
## <u>VIOLATIONS OF THE CRCPA, § 772.103(3), FLA. STAT.</u>

120.    Mr. Beard incorporates Paragraphs 1 – 98 as if fully restated herein.

121.    The Defendants, through their participation in the CC Flow lending platform, constitute an "enterprise" under CRCPA, § 772.102(3), Fla. Stat.

122.    The CC Flow Account charged an interest rate far in excess of Florida's maximum permitted rate and, thus, the loan constitutes "unlawful debt" under § 772.102(2), Fla. Stat.

123.    The Defendants each associated with the enterprise and participated in the affairs of the enterprise, directly or indirectly, for the purpose of the collection of an unlawful debt.

124.   The Defendants' participation in the enterprise violated **§ 772.103(3), Fla. Stat.,** and caused Plaintiff to repay amounts and incur fees as the direct result of Defendants' attempts to collect payment on unlawful loans.

125.   Accordingly, the Defendants are jointly and severally liable to Mr. Beard for treble damages, costs, and attorney's fees pursuant to § 772.104(1), Fla. Stat.

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.   Threefold the amount of actual damages or, in the alternate, the statutory minimum of $200, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.   Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.   Any other relief this Court deems equitable and proper under the circumstances.

## COUNT V
## VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.

126.   Mr. Beard incorporates Paragraphs 1 – 98 as if fully restated herein.

127.   The Defendants, through their participation in the CC Flow lending platform, constitute an "enterprise" under CRCPA, § 772.102(3), Fla. Stat.

128.  The CC Flow Account charged an interest rate far in excess of Florida's maximum permitted rate and, thus, the loan constitutes "unlawful debt" under § 772.102(2), Fla. Stat.

129.  The Defendants violated **§ 772.103(4), Fla. Stat.** by conspiring with each other and/or endeavoring to issue and collect unlawful debts through the CC Flow lending platform.

130.  The Defendants each took actions in furtherance of this conspiracy when they, at various times, did the following:

   a.  issued the CC Flow Account to Mr. Beard;

   b.  initiated ACH deposits to Mr. Beard's bank accounts;

   c.  made attempts to withdraw money via ACH;

   d.  attempted collection of the credit line through emails and phone calls to Mr. Beard; and/or,

   e.  claimed CCB ownership of CC Flow accounts to provide a guise of issuance from a bank.

131.  The Defendants also each agreed to the overall objective of the conspiracy – to issue and collect unlawful loans through CC Flow.

132.  Accordingly, the Defendants are jointly and severally liable to Mr. Beard for treble damages, costs, and attorney's fees pursuant to § 772.104(1), Fla. Stat.

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a. Threefold the amount of actual damages or, in the alternate, the statutory minimum of $200, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b. Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c. Any other relief this Court deems equitable and proper under the circumstances.

## COUNT VI
## CCB's VIOLATIONS OF TILA, 15 U.S.C. § 1632(a)

133. Mr. Beard incorporates paragraphs 1 – 98 as if fully stated herein.

134. CCB engaged in a consumer credit transaction with Mr. Beard when it allowed its name to be used by the other Defendants who financed the CC Flow Account for Mr. Beard.

135. The financing charges exceeded $5 and the CC Flow Account exceeded $75.

136. CCB failed to disclose the *annual percentage rate* clearly and conspicuously in writing.

137. CCB failed to disclose the *finance charge* clearly and conspicuously in writing.

138.    CCB knew it had an obligation to make these disclosures to Mr. Beard under TILA, but pursuant to its business practices which intentionally obfuscate their unlawful rates of interest, it willfully failed to make such disclosures.

139.    Accordingly, CCB violated TILA, 15 U.S.C. § 1632(a).

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against CCB, ordering:

a.    Damages of twice the finance charge, pursuant to 15 U.S.C. § 1640(a)(2)(A)(i), or Mr. Beard's actual damages, whichever are greater;

b.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1640(a)(3); and,

c.    Such other relief that this Court deems just and proper.

## COUNT VII
## CCB's VIOLATIONS OF TILA, 15 U.S.C. § 1637

140.    Mr. Beard incorporates paragraphs 1 – 98 as if fully stated herein.

141.    CCB engaged in a consumer credit transaction with Mr. Beard when it indicated that it financed the CC Flow Account.

142.    The consumer credit transaction was open-ended.

143.    The CC Flow Account used one or more periodic rates to compute the finance charge and CCB did not disclose the corresponding nominal APR in violation of 15 U.S.C. § 1637(a)(4).

144.    The CC Flow Account used one or more periodic rates to compute the finance charge and CCB did not disclose the corresponding nominal APR in each billing cycle statement in violation of 15 U.S.C. § 1637(b)(5).

145.    The CC Flow Account assessed total finance charges exceeding 50 cents each month.

146.    CCB did not disclose the total finance charge as an APR in periodic statements in violation of 15 U.S.C. § 1637(b)(6).

147.    CCB violated 15 U.S.C. § 1637(b)(11)(B)(i) when it did not include with each billing cycle the number of months it would take to pay the entire amount of the balance, if Mr. Beard only paid the required minimum monthly payments and if no further advances were made.

148.    CCB violated 15 U.S.C. § 1637(b)(11)(B)(ii) when it did not include with each billing cycle the total cost to Mr. Beard, including interest and principal payments, of paying that balance in full, if Mr. Beard paid only the required minimum monthly payments and if no further advances were made.

149.    CCB violated 15 U.S.C. § 1637(b)(11)(B)(iii) when it did not include with each billing cycle the monthly payment amount required for Mr. Beard to eliminate the outstanding balance in 36 months, if no further advances were made, and the total cost to Mr. Beard, including interest and principal payments, of paying that balance in full if Mr. Beard paid the balance over 36 months.

150.    CCB failed to provide Mr. Beard with a toll-free number where he could receive information about accessing credit counseling and debt management services, thereby violating 15 U.S.C. § 1637(b)(11)(B)(iv).

151.    CCB knew it had an obligation to make these disclosures to Mr. Beard under TILA, but pursuant to its business practices which intentionally obfuscate its levy of unlawful rates of interest, CCB willfully failed to make such disclosures.

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against CCB, ordering:

      a.    Damages of twice the finance charge, pursuant to 15 U.S.C. § 1640(a)(2)(A)(i), or Mr. Beard's actual damages, whichever are greater;

      b.    Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1640(a)(3); and,

      c.    Such other relief that this Court deems just and proper.

**COUNT VIII**
**UNJUST ENRICHMENT**

152.    Mr. Beard incorporates paragraphs 1 – 98 as if fully stated herein.

153.    Mr. Beard conferred a benefit to the Defendants in the form of payments to the Defendants for his CC Flow Account.

154.    The Defendants had no legal right to the collection of these payments and were therefore unjustly enriched.

155.    The Defendants knew they had no legal right to the collection of these payments, as evidenced by their business model, but chose to accept the funds from Mr. Beard regardless.

**WHEREFORE,** Mr. Beard respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, for:

a.    Actual damages for the payments conferred to the Defendants pursuant to the void extension of credit; and,

b.    Such other relief this Court deems equitable and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Mr. Beard hereby demands a jury trial on all issues so triable.

Respectfully submitted this April 21, 2023, by:

SERAPH LEGAL, P. A.

/s/ *Brandon D. Morgan*
Brandon D. Morgan, Esq.
Florida Bar Number: 1015954
BMorgan@SeraphLegal.com

/s/ *Thomas M. Bonan*
Thomas M. Bonan, Esq.
Florida Bar Number: 118103
TBonan@SeraphLegal.com

1614 North 19th Street
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**<u>ATTACHED EXHIBIT LIST</u>**

A    Mr. Beard's CC Flow Account Agreement, December 20, 2022 - Excerpt

B    Mr. Beard's CC Flow Account Statement, February 1, 2023 - Excerpt

C    Mr. Beard's Clarity Consumer Disclosure, February 20, 2023, CC Flow Account Tradeline - Excerpt